# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 31, 2023

Lyle W. Cayce
Clerk

No. 23-60255

_____

Chamber of Commerce of the United States of America;
Longview Chamber of Commerce;
Texas Association of Business,

*Petitioners*,

*versus*

United States Securities and Exchange Commission,

*Respondent*.

_____

Appeal from an Order of
the Securities and Exchange Commission
Agency Nos. 34-97424,
88 Fed. Reg. 36002, IC-34906

_____

Before Smith, Southwick, and Higginson, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

The Securities and Exchange Commission ("SEC") adopted a rule requiring issuers to report day-to-day share repurchase data once a quarter and to disclose the reason why the issuer repurchased shares of its own stock. We consider a challenge to that rule by petitioners Chamber of Commerce of the United States, Longview Chamber of Commerce, and Texas Association of Business ("petitioners").

No. 23-60255

## I.

Publicly traded companies have a responsibility to their shareholders to allocate capital in the most efficient way possible. One way in which companies fulfill this responsibility is by reinvesting capital in themselves by repurchasing their own shares. Such repurchases are common and occur whenever an issuer of securities ("issuer") purchases its own stock.

There are many different reasons why a company might repurchase its shares. Some of those reasons are for the benefit of shareholders, as when a company repurchases its own shares because it believes they are undervalued. Others could make investors less likely to buy or retain shares, as where a repurchase is motivated by a desire to achieve accounting metrics or to impact executive compensation.

In response to increasing public skepticism of share repurchases, the SEC conducted a study on buybacks and why issuers repurchase their own shares. The study concluded that repurchasing shares can be an efficient use of capital and may indicate that an issuer's shares are undervalued.

The SEC, however, still believed investors could benefit from enhanced repurchase disclosures designed to address supposed information asymmetries between investors and issuers as to why an issuer was repurchasing its shares. The SEC's rationale was that, because a share repurchase could signal either that the issuer's shares were undervalued (and hence an attractive investment) or that the company was attempting to boost its metrics (and hence a poor investment), shareholders, in order to make fully informed investment decisions, needed to know why a company was repurchasing its shares.

No. 23-60255

The SEC proposed a rule to address that concern.[1] The proposed rule required issuers to report certain repurchase data within one business day of the repurchase and to disclose the reason why the issuer was repurchasing its shares. The proposed rule stated that the SEC was unable to quantify most of the economic effects of the proposed amendments. Thus, the SEC relied primarily on a qualitative assessment of the rule's potential effects, while encouraging commenters to provide information that could help quantify the costs and benefits of the proposed rule. The SEC solicited comments on the proposed rule during a 45-day comment period, which was reopened briefly to account for a technical difficulty in submitting comments.[2] The comment period was again reopened, this time for 30 days, to allow for new comments regarding the impact of an excise tax imposed by the Inflation Reduction Act.[3]

During the comment period, petitioners submitted guidance explaining how the SEC could quantify the proposed rule's effects. Specifically, petitioners alerted the SEC to empirical data from academic sources and information available in existing SEC disclosures that could be used to quantify the economic effects of the proposed rule.

The SEC adopted the final rule on May 3, 2023. As with the proposed

---

[1] The SEC issued this rule under the Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881 (1934) (codified as amended at 15 U.S.C. § 78a *et seq.*), and the Investment Company Act of 1940, Pub. L. No. 76-768, 54 Stat. 789 (1940) (codified as amended at 15 U.S.C. § 80a-1 *et seq*). No party disputes the SEC's statutory authority to promulgate the final rule.

[2] Resubmission of Comments and Reopening of Comment Periods for Several Rulemaking Releases due to a Technological Error in Receiving Certain Comments, 87 Fed. Reg. 63016, 63016–17 (Oct. 18, 2022).

[3] Reopening of Comment Period for Share Repurchase Disclosure Modernization, 87 Fed. Reg. 75975, 75975–77 (Dec. 12, 2022).

rule, the final rule requires issuers to disclose their reasons for repurchasing shares ("the rationale-disclosure requirement"). The final rule also requires issuers to collect repurchase data on a day-to-day basis, but in contrast to the proposed rule, issuers need file this day-to-day data only once per quarter ("the daily-disclosure requirement").

Despite petitioners' comments, however, the SEC maintained that many of the effects of the daily-disclosure requirement could not be quantified. The SEC did, however, perform a cost-benefit analysis for both the rationale-disclosure requirement and the daily-disclosure requirement. The agency continued to believe that the final rule would help investors evaluate whether a share repurchase was intended to increase the value of the issuer's shares or, instead, was undertaken for a purpose unrelated to the market value of the issuer's shares.

On May 12, 2023, petitioners filed a petition for review of the final rule with this court. *See* 15 U.S.C. § 80a-42(a). They assert that (1) the rationale-disclosure requirement violates the First Amendment by impermissibly compelling their speech; (2) the SEC acted arbitrarily and capriciously in adopting the final rule by not considering their comments or conducting a proper cost benefit analysis; and (3) the SEC did not provide the public with a meaningful opportunity to comment.

## II.

We review the SEC's answers to purely legal questions *de novo*. *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010). Factual findings the SEC has "identified . . . as the basis, in whole or part, of the rule" are "conclusive" if "supported by substantial evidence." 15 U.S.C. § 78y(b)(4). "We review constitutional issues *de novo*." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021).

The Administrative Procedure Act ("APA") requires us to "set

aside" agency actions found to be "arbitrary [or] capricious," "contrary to constitutional right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(B), (D); *see also* 15 U.S.C. § 78y(b)(4). Arbitrary-and-capricious review requires this court to scrutinize the record to determine whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). We "may not supply a reasoned basis for the agency's decision that the agency itself has not given." *Id.* Finally, we "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021) (cleaned up).

## III.

We turn first to petitioners' claim that the rationale-disclosure requirement violates the First Amendment by impermissibly compelling their speech. The First Amendment "includes both the right to speak freely and the right to refrain from speaking." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Thus, laws compelling speech normally trigger strict scrutiny and "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Nat'l Inst. Fam. & Life Advocs. v. Becerra* ("*NIFLA*"), 138 S. Ct. 2361, 2371 (2018) (cleaned up). But lesser scrutiny applies when the government compels disclosures in the context of commercial speech because "the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides." *See Zauderer v. Off. Disciplinary Couns. Sup. Ct. Ohio*, 471 U.S. 626, 651 (1985).

This means that "[s]tates may require commercial enterprises to dis-

close 'purely factual and uncontroversial information' about their services" so long as those disclosures are "reasonably related to a legitimate state interest" and not "unjustified or unduly burdensome."[4] The SEC's primary defense to petitioner's constitutional challenge is that the rationale-disclosure requirement is governed by *Zauderer* and that it can survive the lower level of scrutiny. Therefore, we must determine whether *Zauderer* applies because the rationale-disclosure requirement compels issuers to disclose "purely factual and uncontroversial information" in the context of commercial speech. *See Zauderer*, 471 U.S. at 651.[5] If so, the rationale-disclosure requirement is constitutionally permissible so long as it "reasonably relate[s] to a legitimate state interest" and is not "'unjustified or unduly burdensome.'" *See NetChoice*, 49 F.4th at 585 (quoting *Zauderer*, 471 U.S. at 651).

*1. Zauderer applies because the rationale-disclosure requirement compels the disclosure of factual and uncontroversial information in the context of commercial speech.*

First, *Zauderer's* lower level of scrutiny applies only to compelled disclosures that are "purely factual." *See* 471 U.S. at 651. Petitioners assert that the rationale-disclosure requirement compels issuers to disclose their reasons for repurchasing stock and that by its very nature, an issuer's subjective

---

[4] *See NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 485 (5th Cir. 2022) (quoting *Zauderer*, 471 U.S. at 651), *cert. granted*, 2023 WL 6319650 (Sept. 29, 2023). The grant of certiorari does not change the fact that *NetChoice* remains binding precedent unless and until the Supreme Court says otherwise. *See Wicker v. McCotter*, 798 F.2d 155, 157–58 (5th Cir. 1986).

[5] The parties do not dispute that the rationale-disclosure requirement compels disclosures only where issuers engage in commercial speech, so we need only determine whether the rationale-disclosure requirement compels purely factual, uncontroversial speech.

opinion about the business benefits of its actions cannot be a purely factual disclosure. Essentially, petitioners urge that any compelled disclosure that requires an issuer to explain why it is repurchasing stock cannot be a purely factual disclosure. That contention, however, is foreclosed by *NetChoice*.

*NetChoice* dealt with a First Amendment challenge to Texas Business & Commerce Code § 120.103(a)(1), which regulates large social media platforms. That provision "obligate[d] the Platforms to explain their content removal decisions."[6] *NetChoice* analyzed the constitutionality of Section 120.103(a)(1) under *Zauderer* and held that forcing social media platforms to explain their reasons for removing content compelled "disclosures that consist of purely factual and uncontroversial information." *See NetChoice,* 49 F.4th at 485–88 (cleaned up).

*NetChoice* stands for the proposition that forcing a company to "explain the reason" for its actions is a purely factual disclosure. *See id.* at 446, 485. If forcing a social media company to explain why it removed posts compels a purely factual disclosure, it follows that forcing issuers to explain why they are repurchasing their shares also compels a purely factual disclosure.

Although petitioners' reply brief all but concedes that *NetChoice* applies, they instead attempt to minimize the opinion's impact. They assert that this part of *NetChoice* was *dictum* because NetChoice supposedly did not dispute that its reasons for removing content constituted purely factual information. But that is not so: Though NetChoice's brief could have done a better job at articulating *Zauderer*'s standard, it did repeatedly contend that

---

[6] *NetChoice,* 49 F.4th at 485; Tex. Bus. & Com. Code § 120.103(a)(1) ("[T]he social medial platform shall . . . notify the user who provided the content of the removal and explain the reason the content was removed.").

*Zauderer* did not apply because the Texas statute compelled disclosures that were not purely factual, uncontroversial information.[7]  Therefore, determining that *Zauderer* applied was "necessary to the holding of the case" and thus was not *dictum*.  *Cf. FDIC v. Enventure V*, 77 F.3d 123, 125 (5th Cir. 1996).  And since *NetChoice* could not determine whether *Zauderer* applied without deciding whether § 120.103(a)(1) compelled purely factual and uncontroversial information, its holding in this respect was also authoritative.  *See NetChoice,* 49 F.4th at 485–88.

In sum, petitioners do not try to distinguish this matter from *NetChoice*.  Nor can they, for we held there that a law requiring companies to explain the reasons behind their actions compelled the disclosure of purely factual information.  Here too, the rationale-disclosure requirement compels issuers to explain their reasons for repurchasing shares.  That is a purely factual disclosure under *NetChoice*.

Second, even if a compelled disclosure is purely factual, *Zauderer*'s lower level of scrutiny applies only to compelled disclosures concerning "uncontroversial information."  *See Zauderer*, 471 U.S. at 651.  Petitioners contend that *Zauderer* cannot apply because the rationale-disclosure requirement forces the issuers to opine on share repurchases, a topic they consider to be one of the most controversial corporate decisions an issuer can make.

---

[7] *See, e.g.*, Brief of Appellees, at 16, *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 485–87 (5th Cir. 2022) (No. 21-51178) ("Nor can [the Texas law] be saved under the (inapposite) commercial-speech doctrine or the limited *Zauderer* doctrine, which applies only to non-burdensome, purely factual commercial disclosure requirements."); *id.* at 52 ("This case, therefore, is not governed by the *Zauderer* test for compelled speech in commercial advertising.").  *NetChoice* also recognized that the platforms disputed whether *Zauderer* applied.  *See NetChoice,* 49 F.4th at 487 ("[T]he platforms claim the *Zauderer* standard does not apply to disclosure laws that implicate the editorial process—that is, laws requiring publishers to disclose their editorial policies or explain how they exercise editorial discretion.").

That contention is also foreclosed by *NetChoice*.

As explained above, *NetChoice* held that forcing social media platforms to explain their reasons for removing content compelled "disclosures that consist of purely factual and uncontroversial information." *See* 49 F.4th at 485 (cleaned up). It is hard to think of a more controversial topic in current public discourse than content moderation and social media censorship. If a social media company's reason for removing user content was uncontroversial in *NetChoice*, then an issuer's reason for repurchasing its own shares is uncontroversial here.

Petitions rely on *NIFLA* to contend that the rationale-disclosure requirement is controversial. Their reliance is misplaced. *NIFLA* held that *Zauderer* was inapplicable to clinics that were forced to disclose information about state-sponsored abortion services, a topic that the Supreme Court described as "anything but . . . uncontroversial." *NIFLA*, 138 S. Ct. at 2372 (cleaned up). All *NIFLA* says is that abortion is too controversial a topic for *Zauderer* to govern compelled speech relating to it. *See id.* The case is consistent with *NetChoice's* determination that a social media company's reasons for removing content are uncontroversial. Petitioners, in essence, invite us to hold that the reasons behind a share repurchase are so much more controversial than the reasons behind social media censorship that they engender a similar level of controversy as does abortion. We decline that invitation. *NetChoice* governs and requires us to hold that the rationale-disclosure requirement compels only uncontroversial information.

In summary, then, the rationale-disclosure requirement compels issuers to disclose "purely factual and uncontroversial information" in the context of commercial speech, and its constitutionality is governed by *Zauderer*.

*2. The rationale-disclosure requirement satisfies Zauderer because the rule is justified, is reasonably related to a legitimate state interest, and does not burden petitioners' protected speech.*

*Zauderer* allows "[s]tates [to] require commercial enterprises to disclose 'purely factual and uncontroversial information' about their services" so long as those disclosures are not "'unjustified or unduly burdensome'" and are "reasonably related to a legitimate state interest." *NetChoice*, 49 F.4th at 485 (quoting *Zauderer*, 471 U.S. at 651). The SEC bears the burden of showing that the rationale-disclosure requirement is neither unjustified nor unduly burdensome. *NIFLA*, 138 S. Ct. at 2377.[8] The SEC has satisfied that burden.

First, a compelled disclosure cannot be permitted if it is "unjustified." *Zauderer*, 471 U.S. at 651. That means the disclosure must be "reasonably related to a legitimate state interest" such that it "remed[ies] a harm that is potentially real not purely hypothetical." *NetChoice*, 49 F.4th at 485; *NIFLA*, 138 S. Ct. at 2377 (internal quotation marks omitted). A compelled disclosure is reasonably related to a legitimate state interest when it is "no broader than reasonably necessary" to further that interest. *See NIFLA*, 138 S. Ct. at 2377 (internal quotation marks omitted).

In contrast, a compelled disclosure has purely hypothetical benefits when the government "points to nothing" supporting its interest. *See id.*

---

[8] Despite language in *NetChoice* that could be read as describing the reasonable-relation requirement as a separate prong of *Zauderer*, the opinion makes clear that assessing whether a compelled disclosure is reasonably related to a legitimate state interest is how we determine whether a compelled disclosure is justified. *See NetChoice*, 49 F.4th at 485 ("Texas argues—and the Platforms do not dispute—that Section 2 advances the State's interest . . . Therefore, the only question is whether the State has carried its burden to show that the three categories of disclosures required by Section 2 are not unduly burdensome.").

Any assumptions the government makes in justifying the compelled disclosure must be more than "speculative." *Zauderer*, 471 U.S. at 652.

The SEC has a legitimate interest in promoting the free flow of commercial information. *See Lamar Outdoor Adver. Inc., v. Miss. State Tax Comm'n*, 701 F.2d 314, 323 (5th Cir. 1983). The rationale-disclosure requirement is reasonably related to that interest. The SEC adopted the requirement because of a supposed asymmetry in information surrounding the reasons issuers repurchase their shares. The SEC cited empirical evidence demonstrating that issuers could have many different reasons for repurchasing shares. Some, such as increasing the value of the shares, are beneficial to investors. Others, such as a desire to achieve accounting metrics or impact executive compensation, could make purchasers less inclined to invest.

The stated purpose of the rationale-disclosure requirement is to allow investors to separate out and assess the different motivations behind, and impacts of, share repurchases. In the SEC's view, when investors know why a company is repurchasing its shares, they can better evaluate whether a share repurchase was intended to increase the value of the issuer or, instead, represented an inefficient deployment of capital. *Contra NIFLA*, 138 S. Ct. at 2377 ("California points to nothing" supporting its interest).

These rationales may not be enough to survive APA review—*see infra* part IV—but they are more than enough to satisfy this prong of *Zauderer*. The SEC has demonstrated that the information asymmetry surrounding share repurchases is a "potentially real not purely hypothetical" harm to investors. *See NIFLA*, 138 S. Ct. at 2377 (internal quotation marks omitted). The rationale-disclosure rule reaches no broader than necessary to address this harm because the only speech it compels relates directly to alleviating the information asymmetry.

We need not be persuaded by the SEC's reasoning to hold that the

benefits of the rationale-disclosure rule are more than purely hypothetical. Therefore, the rationale-disclosure rule is justified as that word is used in *Zauderer*.

Second, even if a compelled commercial disclosure is justified, it still violates the constitution if it "unduly burden[s]" a speaker's "protected commercial speech." *NetChoice*, 49 F.4th at 486 (cleaned up). In *NIFLA*, the Court held that a California statue compelling a provider of pregnancy-related services to include a government-sponsored message in promotional materials was unduly burdensome. *See* 138 S. Ct. at 2377–78. The statute required the inclusion of a lengthy message emphasized "by some method such as larger text or contrasting type or color." *Id.* at 2378. That was unduly burdensome because it "drown[ed] out the facility's own message." *Id.*

Here, in contrast, the rationale-disclosure requirement neither burdens issuers' protected speech nor drowns out their message. The issuer is free to speak (or not) however and whenever it wishes apart from a privately crafted explanation of its reasons for repurchasing shares. That is a far lesser burden than was the California law the Court found unduly burdensome in *NIFLA*, which mandated a "29-word statement from the government, in as many as 13 different languages." *See id.* A requirement that compels speech solely within the narrow confines of SEC filings is not the type of forced disclosure that would meaningfully "chill protected commercial speech." *NetChoice*, 49 F.4th at 486 (cleaned up).

In sum, the rationale-disclosure requirement is not unduly burdensome, and because both elements of the *Zauderer* test are met, the requirement passes constitutional muster.

## IV.

Petitioners claim that the final rule violates the APA. They aver the SEC acted arbitrarily and capriciously when it failed to (1) quantitatively

analyze the economic implications of its proposed rule whenever feasible, (2) respond to petitioners' comments about the agency's economic implications analysis adequately, and (3) substantiate the proposed rule's benefits adequately.[9]

*1. The SEC is not required to quantify economic implications generally.*

The Exchange Act and the Investment Companies Act ("ICA") require the SEC to consider "whether [an] action will promote efficiency, competition, and capital formation" whenever it engages in rulemaking and is "required to consider or determine whether an action is "necessary or appropriate in the public interest," 15 U.S.C. § 78c(f), or "consistent with the public interest," *id.* § 80a-2(c). Those two statutory commands, petitioners urge, require the SEC to "determine as best it can the economic implications of the rule it has proposed." *Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005). According to petitioners, quantitative data is the "best" data, so they adduce the SEC cannot rely merely on qualitative analyses without first explaining why a rule's costs and benefits "could not be quantified." In other words, petitioners contend that a qualitative economic impact analysis will satisfy SEC's statutory obligation only where it is unable feasibly to conduct any quantitative analysis.

The SEC disagrees, positing that it is duty-bound only to conduct a "reasonable and reasonably explained" analysis. *Huawei*, 2 F.4th at 452

---

[9] Petitioners raise three additional reasons the rule is arbitrary and capricious. Specifically, they contend the SEC (1) failed to consider adequately whether the additional disclosures would overwhelm retail investors and disincentivize information collection efforts; (2) ignored fixed costs in its analysis of the share repurchase excise tax; and (3) did not consider all costs and benefits it identified in its analysis of the rule's overall effect. But as we explain in the main text, each of petitioners' primary contentions justifies granting the petition for review. It is therefore unnecessary for us to resolve petitioners' additional theories.

(internal quotation marks omitted).  The agency states that it "need not base its every action upon empirical data and may reasonably conduct a general analysis based on informed conjecture." *Nasdaq Stock Mkt. L.L.C. v. SEC*, 34 F.4th 1105, 1111 (D.C. Cir. 2022) (cleaned up).

We agree with the SEC that, as a general matter, it is not required to undertake a quantitative analysis to determine a proposed rule's economic implications.  The relevant statutory provisions providing the SEC with rule-making authority do not stipulate such a requirement—they merely command the SEC to "consider . . . whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. §§ 78c(f), 80a-2(c).  Per the text, the agency is only told to "consider," and that term—shorn of modifiers or limiters—does not restrict the universe of otherwise permissible methods by which the SEC can analyze the economic implications of a proposed rule.

Nor do the statutorily stipulated objects of consideration lend any support to petitioners' position.  A rigorous quantitative cost-benefit analysis is one way—but not the only way—to determine whether a proposed rule "promote[s] efficiency, competition, and capital formation." *Id.*  Accordingly, there is no textual basis to conclude that the SEC must analyze economic impacts using quantitative methods whenever it is feasible.[10]

Petitioners, citing *Business Roundtable v. SEC*[11] and *Chamber of Commerce*, maintain the D.C. Circuit has concluded to the contrary.  Not so.

---

[10] Nor could such a quantitative analysis requirement be read into the relevant statutory provisions.  "Where Congress has required 'rigorous, quantitative economic analysis,' it has made that requirement clear in the agency's statute." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013) (quoting *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 986 (D.C. Cir. 1985)); *see, e.g.*, 2 U.S.C. § 1532(a)(2) (mandating "a *qualitative and quantitative* assessment of the anticipated costs and benefits" (emphasis added)).  No such statutory requirement is imposed here.

[11] 647 F.3d 1144 (D.C. Cir. 2011).

No. 23-60255

Neither lends support to their theory that the Exchange Act and ICA require the SEC to conduct a quantitative economic analysis whenever feasible.

In *Chamber of Commerce*, the D.C. Circuit held that difficulties in determining a rule's precise costs "d[id] not excuse the [SEC] from its statutory obligation" because the agency could still have provided a "range within which [the] cost . . . will fall." 412 F.3d at 143. And *Business Roundtable* held that SEC's failure adequately to "quantify the certain costs or to explain why those costs could not be quantified" was one basis justifying vacatur. 647 F.3d at 1149. But in *Chamber of Commerce*, SEC "stopped" its cost analysis after asserting "it had no 'reliable basis for estimating those costs.'"[12] Similarly, in *Business Roundtable*, SEC's prediction "had no basis beyond mere speculation" and was functionally equivalent to no economic impact analysis at all. 647 F.3d at 1150.

Neither case restricts the SEC's ability to rely on a qualitative analysis for its determination of economic impact.[13] Neither *Chamber of Commerce* nor *Business Roundtable* supports petitioners' reasoning. It is within the agency's discretion[14] to determine the mode of analysis that most allows it "to determine as best it can the economic implications of the rule it has

––––––––––––––––––––––

[12] 412 F.3d at 144 (quoting Investment Company Governance, 69 Fed. Reg. 46378, 46387 n.81 (Aug. 2, 2004)).

[13] *See Nasdaq*, 34 F.4th at 1113 (distinguishing *Business Roundtable* since SEC "explained in detail why [the rule's effect on] competition would ultimately benefit investors").

[14] Such discretion is still bounded by default APA requirements. First, the SEC cannot act arbitrarily and capriciously in choosing the mode of analysis that it uses to analyze the economic implications of its proposed rule. Second, regardless of the mode of analysis chosen, the agency "must cogently explain why it has exercised its discretion in a given manner and must offer a rational connection between the facts found and the choice made." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1214 (5th Cir. 1991) (cleaned up) (quoting *Chem. Mfrs. Ass'n v. EPA*, 899 F.2d 344, 359 (5th Cir. 1990).

proposed." *Chamber of Commerce*, 412 F.3d at 143.

### 2. The SEC failed to respond to petitioners' comments.

Petitioners contend that the SEC failed to respond to their comments about the proposed rules' economic implications. Under the arbitrary-and-capricious standard, the SEC must show that it has "reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). That requires the agency to consider all relevant factors raised by the public comments and provide a response to significant points within. *See Huawei*, 2 F.4th at 449. Comments the agency must respond to include those that "can be thought to challenge a fundamental premise underlying the proposed agency decision"[15] or include points that "if true and adopted would require a change in an agency's proposed rule."[16]

The SEC, in its proposed rule, stated that "[m]any of the [economic] effects . . . cannot be quantified." Share Repurchase Disclosure Modernization, 87 Fed. Reg. 8443, 8451 (Feb. 15, 2022). That prompted the agency to do two things: First, it "encourage[d] commenters to provide data and information that would help quantify the benefits, costs, and the potential impacts of the proposed amendments on efficiency, competition, and capital formation." *Id.* Second, for the economic effects the SEC asserted it was "unable to quantify," the agency "provide[d] a qualitative assessment." *Id.* Indeed, in both the proposed and final rule, the SEC claimed that it provided quantified economic effects "wherever possible." *Id.*; Share Repurchase

---

[15] *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (cleaned up) (quoting *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C. Cir. 2000)).

[16] *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023) (cleaned up) (quoting *Huawei*, 2 F.4th at 449).

Disclosure Modernization, 88 Fed. Reg. 36002, 36029 (June 1, 2023). Petitioners maintain—and we agree—that is not so.

Petitioners point to three suggestions they submitted to the SEC that explained how the agency could quantify the proposed rule's effects. They suggested the SEC should quantify

1. "the percentage of issuers' annual and long-term incentive plans that is tied to [earnings per share] and how it correlates with buybacks" based on readily available "academic databases" that "provide detailed data on executive compensation";
2. "how many issuers used share repurchases to trigger an executive bonus that would not have been earned without repurchasing shares" and "the total executive compensation awarded from potentially opportunistic buybacks." They note a British study had conducted such an estimate for U.K. issuers, and the SEC could just "replicate the threshold analysis" of that study using preexisting U.S. data;
3. "the incremental benefits of potential reductions in asymmetric information stemming from the proposed amendments" by (i) "examin[ing] how investors react to more frequent repurchase disclosure" in other jurisdictions; (ii) using existing studies to "compare liquidity measures of similarly sized issuers operating in the same industry that conduct buybacks across countries" with different disclosure frequencies; or (iii) examining the movement of stock prices on days that repurchases are disclosed in jurisdictions with daily reporting.

The SEC admits it never considered any of petitioners' suggestions.[17]

---

[17] Oral argument was the first time the SEC attempted to engage with the substance of petitioners' suggestions. That's too late. We don't evaluate *post-hoc* justifications, given that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *BNSF Ry. Co. v. Fed. R.R. Admin.*, 62 F.4th 905, 910–11 (5th Cir. 2023) (cleaned

On appeal, it instead blames petitioners for failing to (1) "identify any specific [data] already available that the Commission should have used," and (2) raise points which, if true and adopted, would require a change in an agency's proposed rule. *See Huawei*, 2 F.4th at 449, 453. There is no merit to either of the SEC's *post-hoc* justifications:

The first justification—that the suggestions did not identify data—is demonstrably false. Petitioners' first suggestion flagged academic databases containing datasets from the Incentive Lab by Institutional Shareholder Services. The second suggestion points to *existing SEC* disclosures. And the last expressly references existing academic studies with similar empirical analyses. Such datasets and academic studies are a far cry from the comments at issue in *Huawei* that failed to "identify relevant cost data the agency ignored." 2 F.4th at 453 (emphasis removed). The *Huawei* comments were "asserted without evidence," "speculative," and devoid of any "factual basis." *Id.* at 453–54. Petitioners' suggestions, in contrast, include specific references to readily available data as well as explanations on "how the SEC could use these data to quantify the [r]ule's effects."

The agency's second justification—that petitioners' suggestions did not raise points that, if true and adopted, would require a change in the proposed rule—is also meritless. The SEC, relying on *Prometheus*, avers that "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." 141 S. Ct. at 1160.

The SEC's reliance on *Prometheus* is misplaced. There, the FCC had "repeatedly asked for data" but "received no data" other than the materially incomplete dataset it already possessed and ultimately relied upon. 141 S. Ct. at 1159 (cleaned up). That is not so with the rulemaking at issue in this case:

_____

up).

The SEC *did* receive new data in response to its solicitation. Indeed, in the proposed rule, the SEC expressly asked for and "encourage[d]" commentators to provide "data and information that would help quantify the benefits, costs, and the potential impacts of the proposed rule on efficiency, competition, and capital formation." 87 Fed. Reg. at 8451. And that's exactly what petitioners did—provide data that was either readily accessible to, or already in the possession of, the SEC.

It is hard to fault petitioners for giving the SEC exactly what it had asked for. And that factual distinction makes all the difference: Critical to the holding in *Prometheus* was the FCC's reliance on both "the data it had" and "the absence of any countervailing evidence." 141 S. Ct. at 1159. *Prometheus* thus stands for the proposition that an agency need not create data that doesn't already exist. It offers no support for the SEC's decision to ask for— and then ignore—already-existing data it did not want to consider.

Undeterred, the SEC then characterizes petitioners' comments as mere "recommendation[s] to conduct new studies that [they] contend might produce useful data." That is incorrect. All three suggestions address costs and benefits the SEC identified in the proposed rule, such as the loss of economically efficient buybacks and increased litigation costs for issuers.

The first suggestion is relevant because it addresses the prevalence of improperly motivated buybacks—the very concern motivating the SEC's instant rulemaking. Two of the "incentives for value-destroying or opportunistic repurchases" the agency identified in the proposed rule were "[s]hare price- or EPS-tied compensation arrangements [which] can . . . incentivize executives to undertake repurchases, in an attempt to maximize their compensation, even if such repurchases are not optimal from the shareholder value maximization perspective," 87 Fed. Reg. at 8457, 8454–55. Similarly, the second suggestion sheds light on the strength of the incentives

No. 23-60255

underlying such opportunistic repurchases.  And the third suggestion strikes at the heart of the proposed rule's purported benefit by examining the marginal effect of additional disclosures on regulated entities' behaviors.[18]

All three suggestions provide quantification of the rule's expected costs and benefits—the very same costs and benefits the SEC asserts "cannot be quantified."[19]  That destroys the only basis the agency supplied in support of its decision to conduct a qualitative analysis.[20]  The SEC—by continuing to insist that the rule's economic effects are unquantifiable in spite of petitioners' suggestions to the contrary—has failed to demonstrate that its conclusion that the proposed rule "promote[s] efficiency, competition, and capital formation"[21] is "the product of reasoned decisionmaking."[22]

*3. The SEC failed adequately to substantiate the rule's benefits and costs.*

"[A] regulation is arbitrary and capricious if the agency 'failed to consider an important aspect of the problem.'" *Mexican Gulf Fishing*, 60 F.4th at 973 (quoting *State Farm*, 463 U.S. at 43).  That "includes, of

---

[18] More disclosure isn't always better.  *See, e.g.*, Eugene G. Chewning, Jr. & Adrian M. Harrell, *The Effect of Information Load on Decision Makers' Cue Utilization Levels and Decision Quality in a Financial Distress Decision Task*, 15 ACCT. ORG. & SOC'Y 527, 539–40 (1990); Kevin Lane Keller & Richard Staelin, *Effects of Quality and Quantity of Information on Decision Effectiveness*, 14 J. CONSUMER RES. 200, 211–12 (1987).

[19] 87 Fed. Reg. at 8451 (proposed rule); 88 Fed. Reg. at 36029 (final rule).

[20] *See* 87 Fed. Reg. at 8451 ("[W]e have, wherever possible, attempted to quantify the economic effects expected from these amendments . . . .  Where we are unable to quantify the economic effects of the final amendments, we provide a qualitative assessment."); 88 Fed. Reg. at 36029 (same).

[21] 15 U.S.C. §§ 78c(f), 80a-2(c).

[22] *State Farm*, 463 U.S. at 52; *see also Huawei*, 2 F.4th at 452 ("An agency's decision to rely on a cost-benefit analysis as part of its rulemaking can 'render the rule unreasonable' if the analysis rests on a 'serious flaw.'" (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012))).

course, considering the costs and benefits associated with the regulation." *Id.* And as part of that cost-benefit analysis, the agency must identify benefits that "bear a rational relationship to the . . . costs imposed." *Id.* (citing *Pub. Citizen v. EPA*, 343 F.3d 449, 455 (5th Cir. 2003)).[23]

The SEC contends the rule primarily helps investors "better evaluate whether a share repurchase was intended to increase the value of the firm" or for an improper purpose such as "providing additional compensation to management." 88 Fed. Reg. 36008. The agency also avers that the rule promotes price discovery.[24] But while the rule's purported benefits may be more than purely hypothetical, *see supra* part III.2, neither is adequately substantiated.

Petitioners insist the first benefit is inadequately substantiated because the agency "never substantiated the threshold proposition that improperly motivated buybacks are actually a problem." And while the SEC concedes it never substantiated that proposition in either the proposed or the final rule,[25] the agency nevertheless maintains the rule's first benefit is ade-

---

[23] *See R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023) ("At a bare minimum, '[w]hen an agency changes its existing position, it . . . must at least display awareness that it is changing position and show that there are good reasons for the new policy.'" (quoting *Encino Motorcars LLC v. Navarro*, 579 U.S. 211, 221 (2016))).

[24] *See* 88 Fed. Reg. at 36033 ("The additional quantitative and qualitative disclosures we are adopting are further expected to enhance the information about share repurchases, providing clearer insights into how and why the issuers undertake repurchases and the extent to which they are related to temporary undervaluation of issuer shares, temporary cash windfalls that cannot be deployed to positive-net present value (NPV) investment projects, or other objectives.").

[25] Indeed, the SEC contends in its briefing that "the rule was explicitly *not* premised on th[e] notion" that "'improperly motivated buybacks regularly occur' in 'significant numbers.'" *See* 88 Fed. Reg. at 36007 ("[I]t is not necessary to find that opportunism drives the timing of most issuer share repurchases to conclude that it is appropriate for investors to have more useful information about such repurchases.").

quately substantiated.  That's because, according to the SEC, investors can be uncertain about the true motivations underlying a buyback so long as there exists an opportunity for—and thus possibility of—opportunistic or improperly motivated buybacks.[26]

We agree with petitioners.  If opportunistic or improperly motivated buybacks are not genuine problems, then there is no rational basis for investors to experience any of the uncertainty the SEC now claims warrants the rule.  Concern about uncertainty positively scales with the magnitude and probability of the matter for which one is uncertain.  A reasoned response to uncertainty about matters of low probability or low magnitude should be markedly different from those of high probability and magnitude.  And that only makes common sense:  Tolerance of uncertainty varies depending on considerations of likelihood and severity.

It's no different when it comes to the proposed rule.  The rule's benefit scales with the degree of investor uncertainty in the *status quo*, and that degree of uncertainty is tied to the magnitude and probability of opportunistic or improperly motivated buybacks.  The SEC must therefore show that opportunistic or improperly motivated buybacks are a genuine problem even under its theory of investor uncertainty.  Because the agency has not done so, the first benefit is inadequately substantiated.

The rule's second benefit—promoting price discovery—fares no better than the first.  The SEC theorizes that "more comprehensive and disaggregated, granular information about recent repurchases and prices of such

---

[26] *See, e.g.*, *id.* ("[W]e believe all of the quantitative and qualitative disclosure requirements that we are adopting in this release together will serve to alert investors *to the possibility of* repurchases being motivated, at least in part, by goals unconnected to increasing shareholders value or signaling the issuer's view that its stock is undervalued." (emphasis added)).

repurchases should be useful to investors in inferring the management's evolving beliefs about the company's underlying value and, in conjunction with other disclosures, [thereby] improving price discovery." 88 Fed. Reg. 36032–33.

The SEC's theory is internally contradictory and thus fails adequately to substantiate the rule's price-discovery benefit.[27] That theory rests on the notion that the rule's additional disclosure requirements will mitigate suboptimal voluntary disclosure levels by providing investors with valuable new information. The SEC reasons that these voluntary disclosure levels are suboptimal in the *status quo* because issuers currently withhold information from investors on account of the "the potential costs of leaking valuable private information to competitors." 88 Fed. Reg. 36036. But the agency soon changes tack. In its discussion of the rule's general costs, the SEC adopts the opposite—and contradictory—position: In concluding that costs of disclosing "significant proprietary information" would be "relatively modest for most issuers," the SEC asserts the new disclosures would *not* contain valuable information. 88 Fed. Reg. 36040.

The SEC cannot have it both ways. It is illogical for the rule simultaneously to accept and to reject the reasoning underlying the price discovery benefit. The rule's price discovery benefit is therefore unsubstantiated.[28]

The price-discovery benefit would still be inadequately substantiated even if we were to disregard the fact that the SEC's theory is internally contradictory. First, the agency fails to demonstrate that it considered rele-

_____

[27] *See Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1021 (5th Cir. 2019) ("[A]n agency's action is arbitrary and capricious if illogical on its own terms." (cleaned up)).

[28] *See R.J. Reynolds Vapor Co.*, 65 F.4th at 189 ("[W]hen an agency changes its existing position, it . . . must . . . show that there are good reasons for the new policy." (quoting *Encino*, 579 U.S. at 222) (cleaned up)).

vant factors in concluding the rule's additional disclosures would impose "relatively modest [costs] for most issuers." 88 Fed. Reg. 36040. Looking at the rule's disclosure requirements explains why that is the case. Plainly put: The rule's requirements are clear as mud. Issuers are instructed not to "rely[] on boilerplate language" but are offered no guidance except a non-exclusive and non-exhaustive list compiling myriad suggestions from commentators.[29] Worse still, there is no safe harbor even for issuers whose disclosures discuss all the rule's suggestions. And even when pressed at oral argument, counsel for the SEC offered little in the way of clarifying what disclosures the rule *actually* mandated. The price-discovery benefit is not the product of reasoned decisionmaking.

Regardless, the rule cannot be sustained on the price-discovery rationale even if we were to assume that the price-discovery benefit is adequately substantiated. Under the harmless-error doctrine, a challenged rule survives judicial review notwithstanding error only if such error "clearly had no bearing on the procedure used or the substance of the decision reached."[30]

As explained above, the rule's primary benefit—decreasing investor uncertainty about motivations underlying buybacks—is inadequately sub-

---

[29] These suggestions direct issuers to discuss: (1) "other possible ways to use the funds allocated for the repurchase and [to] compar[e] the repurchase with other investment opportunities that would ordinarily be considered by the issuer, such as capital expenditures and other uses of capital"; (2) "the expected impact of the repurchases on the value of remaining shares"; (3) "factors driving the repurchase, including whether their stock is undervalued, prospective internal growth opportunities are economically viable, or the valuation for potential targets is attractive"; and (4) "the sources of funding for the repurchase, where material, such as, for example, in the case where the source of funding results in tax advantages that would not otherwise be available for a repurchase." 88 Fed. Reg. at 36024.

[30] *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001) (quoting *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir. 1979); *see* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error").

stantiated.  Almost every part of the SEC's justification and explanation of the rule reflects the agency's concern about opportunistic or improperly motivated buybacks.  That error permeates—and therefore infects—the entire rule.  Consequently, we cannot conclude that error in the SEC's substantiation of the first benefit clearly had no bearing on the remainder of the rule.

Because the SEC acted arbitrarily and capriciously in failing adequately to (1) respond to petitioners' comments and (2) substantiate the rule's benefits, we grant the petition for review.

## V.

Petitioners contend the SEC did not provide adequate opportunity for notice and comment.  Under the APA, agencies must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

We disagree with petitioners.  They aver the SEC's initial forty-five-day comment period should "raise red flags" because it was shorter than sixty days.  But the APA generally requires only a minimum thirty-day comment period.[31]  And "while interested parties should be able to participate meaningfully in the rulemaking process, the public 'need not have an opportunity to comment on every bit of information influencing an agency's decision.'" *Tex. Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313, 326 (5th Cir. 2001) (quoting *Texas v. Lyng*, 868 F.2d 795, 800 (5th Cir. 1989)).  We cannot conclude that the initial comment period was so short as to deprive petitioners

---

[31] *Chem. Mfrs. Ass'n*, 899 F.2d at 347.  *See also Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) ("[A] 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." (internal citations omitted)).

of a meaningful opportunity to comment on the proposed rulemaking. Petitioners may have hoped for more time, but it is not for us to decide whether an agency has chosen a maximally net beneficial comment period.

Accordingly, the SEC's notice and comment period satisfies the APA's requirements.

## VI.

The SEC acted arbitrarily and capriciously, in violation of the APA, when it failed to respond to petitioners' comments and failed to conduct a proper cost-benefit analysis. We recognize that "there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022) (quoting *Texas Ass'n of Mfrs. v. US. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021)). Short of vacating the rule, we therefore afford the agency limited time to remedy the deficiencies in the rule.

Because, for the reasons explained, the SEC's adoption of the Share Repurchase Disclosure Modernization Rule is arbitrary and capricious, the petition for review is GRANTED, and this matter is REMANDED with direction to the SEC to correct the defects in the rule within 30 days of this opinion. This is a limited remand. This panel retains jurisdiction to consider the decision that is made on remand.