# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 25, 2025

Lyle W. Cayce
Clerk

—————————

No. 23-60626

—————————

National Association of Private Fund Managers; Managed Funds Association; Alternative Investment Management Association,

*Petitioners*,

*versus*

Securities and Exchange Commission,

*Respondent*.

_____

Appeal from the Securities & Exchange Commission
Agency Nos. Release No. 34-98737,
Release No. 34-98738

_____

Before Wilson and Douglas, *Circuit Judges*, and Vitter, *District Judge*.[*]

Cory T. Wilson, *Circuit Judge*:

The Securities Exchange Commission adopted two rules aimed at increasing transparency in the securities lending and short sale markets. *See* Reporting of Securities Loans (Securities Lending Rule), 88 Fed. Reg. 75644 (Nov. 3, 2023) (codified at 17 C.F.R. § 240.10c-1a); Short Position and Short

_____

[*] United States District Judge for the Eastern District of Louisiana, sitting by designation.

No. 23-60626

Activity Reporting by Institutional Investment Managers (Short Sale Rule), 88 Fed. Reg. 75100 (Nov. 1, 2023) (codified at 17 C.F.R. § 240.13f-2). Petitioners, National Association of Private Fund Managers, Managed Funds Association, and Alternative Investment Management Association, Ltd., challenge the Rules on various grounds. Because the agency failed to consider and quantify the cumulative economic impact of the Rules as required by the governing statutes, we grant the petition for review in part and remand to the agency for further proceedings.

## I.

Securities lending occurs when "securities are transferred temporarily from one party, a securities lender, to another, a securities borrower, for a fee." Securities Lending Rule, 88 Fed. Reg. at 75645. Short sales occur when an investor sells a stock that the investor does not own in hopes that the share price will decrease. Short Sale Rule, 88 Fed. Reg. at 75100–01. To make the sale, the investor must first borrow the requisite shares and later purchase the same number of shares on the market to return to the lender. Securities lending is thus an integral facet of the short sale market, which is in turn an integral component of modern securities markets. Securities Lending Rule, 88 Fed. Reg. at 75645.

According to the Securities and Exchange Commission (the Commission) and at least some market participants, the securities lending market is opaque, in that comprehensive information on current market conditions is generally unavailable to the public. *See id.* at 75644–45. This lack of information makes it challenging for federal regulators to oversee transactions and ensure a fair, orderly, and efficient market. *Id.* at 75645. The short sale market has similar gaps in information accessible to the public and regulators. *See* Short Sale Rule, 88 Fed. Reg. at 75148. And while short selling provides important benefits to securities markets like liquidity and

pricing efficiency, it can also be abused through improper practices like "short and distort" and "naked" short selling strategies.[1] *Id.* at 75101 n.14, 75159–60.

Due to perceived gaps in market information, the Commission sought to increase transparency in both the securities lending and short sale markets under rulemaking authority granted to the agency by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (Dodd-Frank), Pub. L. 111–203, 124 Stat. 1376. Dodd-Frank overhauled financial regulation in the aftermath of the economic downturn in 2008, amending, *inter alia*, the Securities Exchange Act of 1934 (Exchange Act). 15 U.S.C. § 78b; *see* Short Sale Rule, 88 Fed. Reg. at 75100; Securities Lending Rule, 88 Fed. Reg. at 75644. Two Dodd-Frank provisions are relevant to this appeal. Section 984(b), codified as a note to 15 U.S.C. § 78j,[2] gives the Commission the authority to "promulgate rules that are designed to increase the transparency of information available to brokers, dealers, and investors, with respect to the loan or borrowing of securities." And § 929X, codified at 15 U.S.C. § 78m(f)(2), gives the Commission rulemaking authority to require

---

[1] The goal of a "short and distort" strategy is to manipulate the market by "first short[ing] a stock and then engag[ing] in a campaign to spread unverified bad news about the stock with the objective of panicking other investors into selling their stock in order to drive the price down." Short Sale Rule, 88 Fed. Reg. at 75159. "Naked" short selling "refers generally to selling short without having stock available for delivery and intentionally failing to deliver stock within the standard three-day settlement cycle." "Naked" Short Selling Antifraud Rule, Exchange Act Release No. 34–58774, 73 Fed. Reg. 61666, 61667 (Oct. 17, 2008).

[2] "Statutory notes are provisions of law placed after the text of a United States Code section. They exist throughout the United States Code" and are valid prima facie evidence of the laws of the United States. Shawn G. Nevers and Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes in the United States Code*, 112 Law Libr. J. 213, 213 (2020); 1 U.S.C. § 204; *see Conyers v. Merit Sys. Prot. Bd.*, 388 F.3d 1380, 1382 n.2 (Fed. Cir. 2004) (That language "was codified as a statutory note is of no moment."). For ease of reference hereafter, we cite to Dodd-Frank § 984(b) or § 78j note.

"the public disclosure of the name of the issuer and the title, class, CUSIP number,[3] aggregate amount of the number of short sales of each security, and any additional information determined by the Commission following the end of the reporting period."

Proceeding under § 984(b), the Commission proposed the Securities Lending Rule on November 18, 2021, with a comment period through January 7, 2022. Reporting on Securities Loans (Proposed Securities Lending Rule), 86 Fed. Reg. 69802 (proposed Nov. 18, 2021). The Rule applies to "[a]ny person that agrees to a covered securities loan on behalf of a lender ('intermediary')"; "[a]ny person that agrees to a covered securities loan as a lender when an intermediary is not used"; and brokers or dealers that "borrow[] fully paid or excess margin securities." Securities Lending Rule, 88 Fed. Reg. at 75647, 75649–50, 75742. The Proposed Securities Lending Rule required securities loan transactions to be reported to the Financial Industry Regulatory Authority (FINRA) within fifteen minutes of execution, followed by publication of transaction-by-transaction data "as soon as practicable." Proposed Securities Lending Rule, 86 Fed. Reg. at 69851–52.

A few months later, on February 25, 2022, the Commission proposed the Short Sale Rule under § 929X. Short Position and Short Activity Reporting by Institutional Investment Managers (Proposed Short Sale Rule), 87 Fed. Reg. 14950 (proposed Feb. 25, 2022). The proposed regulation applied to institutional investment managers[4] and required reporting and

---

[3] A CUSIP number is assigned by the Committee on Uniform Securities Identification Procedures.

[4] An institutional investment manager is "any person, other than a natural person, investing in or buying and selling securities for its own account, and any person exercising

publication of short sale data on an aggregate, monthly basis. *Id.* at 14950–51. Reports were to be filed through the Commission's Electronic Data Gathering, Analysis, and Retrieval system (EDGAR). *Id.* at 14955–57. The Commission contemporaneously reopened the comment period for the Securities Lending Rule "so that commenters may consider whether there would be any effects of [the Proposed Short Sale Rule] that the Commission should consider in connection with [the Proposed Securities Lending Rule]." Reopening of Comment Period for Reporting of Sec. Loans, Exchange Act Release No. 34-94315, 87 Fed. Reg. 11659, 11659 (proposed Mar. 2, 2022).

The Commission adopted the final Rules on October 13, 2023. Securities Lending Rule, 88 Fed. Reg. at 75742; Short Sale Rule, 88 Fed. Reg. at 75186. The final Securities Lending Rule differs in a few material ways from the proposed version: It delays the reporting timeframe from fifteen minutes after a reportable transaction until the end of the day, and it delays reporting of information about the size of each individual loan until twenty business days after a transaction is effected. Securities Lending Rule, 88 Fed. Reg. at 75665. The final Short Sale Rule contains no differences from the proposed version that are material to this appeal.

Petitioners, several member organizations of institutional investment managers, challenge both Rules under the Administrative Procedure Act (APA) and the Exchange Act.[5] Their primary challenges center on the interplay between the Rules and purported inconsistencies between them

---

investment discretion with respect to the account of any other person." 15 U.S.C. § 78m(f)(6).

[5] Petitioners have associational standing to bring suit as "(1) [their] members would otherwise have standing to sue in their own right; (2) the interests [they] seek[] to protect are germane to the organization[s'] purpose[s]; and (3) neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

that Petitioners contend doom both Rules as arbitrary and capricious. In a nutshell, Petitioners argue that both Rules should be vacated because they are irreconcilably contradictory—the disclosures required by the Securities Lending Rule will reveal the very information the Short Sale Rule seeks to protect—and because the Commission failed to consider the Rules' collective economic impact.

Petitioners also attack the Rules individually. They contend that the Securities Lending Rule exceeds the Commission's statutory authority and that the Commission did not provide adequate opportunity for comment before it promulgated the final rule. Regarding the Short Sale Rule, they assert that the Commission failed to explain why it did not use a less burdensome reporting alternative and that the Rule impermissibly applies to extraterritorial transactions.

## II.

Under the APA, this court must uphold the Commission's action unless it is in "excess of statutory jurisdiction, authority, or limitations," or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C). "[W]e review questions of law de novo, without deference to the agency's conclusions." *Davidson v. Glickman*, 169 F.3d 996, 1000 (5th Cir. 1999) (citations omitted). And the Commission's factual findings are "conclusive" if "supported by substantial evidence." 15 U.S.C. § 80b-13(a).

Arbitrary-and-capricious review requires this court to scrutinize the record to determine whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168

(1962)).  This court "may not supply a reasoned basis for the agency's action that the agency itself has not given."  *Id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).  Finally, "we must set aside any action premised on reasoning that fails to account for 'relevant factors' or evinces 'a clear error of judgment.'"  *Univ. of Tex. M.D. Anderson Cancer Ctr. v. U.S. Dep't of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

In addition to adhering to the APA's requirements, the Commission has a "unique obligation" to comply with the considerations enumerated in the Exchange Act when promulgating rules.  *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (citing 15 U.S.C. §§ 78c(f), 78w(a)(2), 80b-2(c)).  Specifically, the Commission must consider the effect of a new rule upon "efficiency, competition, and capital formation."  *Id.*  And "its failure to 'apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation' makes promulgation of the rule arbitrary and capricious and not in accordance with law."  *Id.* (quoting *Chamber of Com. of U.S. v. SEC* (*Chamber of Com. (D.C. Circuit)*), 412 F.3d 133, 144 (D.C. Cir. 2005)).

## III.

We begin with Petitioners' targeted challenges to the Securities Lending Rule.  They contend that (A) the Rule is unlawful because it exceeded the scope of the Commission's statutory authority and (B) the Commission did not give the public adequate opportunity to comment.  We disagree on both points.

## A.

When reviewing a statute that "delegates discretionary authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress

subject to constitutional limits." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). "The court fulfills that role by recognizing constitutional delegations, 'fixing the boundaries of the delegated authority,' and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* (cleaned up). In matters of statutory interpretation, "[w]e begin, as always, with the text of the statute." *United States v. Palomares*, 52 F.4th 640, 642 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 1092 (2024) (mem.). "If the statute is clear and unambiguous 'that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Bd. of Governors of Fed. Rsrv. Sys. v. Dimension Fin. CorPage*, 474 U.S. 361, 368 (1986) (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984), *overruled on other grounds by Loper Bright*, 603 U.S. 369).

As discussed *supra*, the Commission adopted the Securities Lending Rule pursuant to Dodd-Frank § 984(b), which directs the Commission to promulgate rules "designed to increase the transparency of information available to brokers, dealers, and investors, with respect to the loan or borrowing of securities." There is no question that "the statute authorize[s] the challenged agency action." *Loper Bright*, 603 U.S. at 406. That is, § 984(b) expressly directs the Commission to facilitate more transparency in securities lending—ostensibly what the Securities Lending Rule aims to do. *Compare* 15 U.S.C. § 78j note (delineating scope of rulemaking "to increase the transparency" of "the loan or borrowing of securities"), *with* Securities Lending Rule, 88 Fed. Reg. at 75644 (stating that the purpose of the Rule is to "increase the transparency and efficiency of the securities lending market").

Petitioners counter that the Commission's authority under § 984(b) is cabined by § 929X of Dodd-Frank, under which the Commission promulgated the Short Sale Rule:

The Commission shall prescribe rules providing for the public disclosure of the name of the issuer and the title, class, CUSIP number, aggregate amount of the number of short sales of each security, and any additional information determined by the Commission following the end of the reporting period. At a minimum, such public disclosure shall occur every month.

15 U.S.C. § 78m(f)(2). Petitioners reason that this language not only prescribes reporting of short sale data but also dictates when and how securities loan disclosures must occur, i.e., only on an aggregate, monthly basis. Essentially, Petitioners' construction of the two statutes hinges on a theory that securities loans are direct proxies for short sales, such that disclosures of the former are effectively disclosures of the latter. And because securities lending data reveal short sale data, Petitioners argue that § 929X governs rulemaking as to both.

But for reasons discussed in detail *infra*, Petitioners' theory that securities loan data are "direct proxies" for short sale data is faulty, at least to the extent that Petitioners assert the two data sets are equivalent. The Commission determined, with factual support in the record, that they are not—regardless of the overlap between them. That conclusion undermines the notion that § 984(b) and § 929X of Dodd-Frank must be read in tandem to demarcate the Commission's rulemaking authority under either provision, or both.

Beyond that, Petitioners' argument fails as a matter of statutory interpretation. First, their reading would largely render § 984(b) surplusage, contrary to "the will of Congress." *Loper Bright*, 603 U.S. at 395. If § 929X controlled the Commission's ability to regulate securities lending data, as synonymous with short sale data, § 984(b) would do little work of its own. Congress's choice to address the regulation of securities lending and short sales via two separate statutes was deliberate, and we must treat it as a

9

deliberate choice. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("Just as Congress'[s] choice of words is presumed to be deliberate, so too are its structural choices."). And there is no support in Dodd-Frank for engrafting the limitations of § 929X onto § 984(b). *Cf. Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alteration in original) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). The two provisions are not adjacent in the law, and it is not otherwise apparent from text or context that they are interdependent. *See Nat'l Ass'n of Priv. Fund Managers v. SEC*, 103 F.4th 1097, 1111 (5th Cir. 2024) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012))).

Simply put, Congress enacted two separate, and specific, delegations of rulemaking authority—one for securities lending, and one for short sales. In § 984(b), Congress directed the Commission to adopt rules "to increase the transparency of information" regarding securities lending. The Securities Lending Rule aims to accomplish that directive by requiring certain parties to securities loans to report the material terms of each covered transaction to FINRA, which will then make specified aggregated information publicly available. *See* 17 C.F.R. § 240.10c-1a(a), (c), (g). Petitioners offer no support for the idea that Congress intended, *sub silentio*, to map the parameters it articulated for short sale disclosures in Dodd-Frank § 929X onto its rulemaking directive in § 984(b) for securities loans.

And even if the limitations of § 929X applied to the Securities Lending Rule, the Commission did not exceed that statute in promulgating the Rule. Petitioners posit that § 929X's proviso that "[a]t a minimum, such public

disclosure shall occur every month," 15 U.S.C. § 78m(f)(2), means securities loan information may not be disclosed daily, as the Rule requires. But § 929X expressly sets a *minimum* disclosure frequency, not a maximum. Put differently, nothing in § 929X prevents the Commission from requiring disclosures more often than monthly, just as it did in the Securities Lending Rule. The statute plainly requires at least monthly reporting, and the daily reporting required by the Securities Lending Rule fits comfortably within that range.

Petitioners also attack the Securities Lending Rule as an improper departure from prior Commission determinations and practice. For support, they point to a 2014 Commission staff report that concluded that publication of real-time, transaction-by-transaction short sale data could harm price efficiency and reduce liquidity. *See* SEC, *Short Sale Position and Transaction Reporting* (June 5, 2014), https://www.sec.gov/files/short-sale-position-and-transaction-reporting0.pdf. Petitioners contend that the new Rule's requirement of daily, transaction-by-transaction disclosure of securities lending data reversed the Commission's prior stance with no explanation of why it disregarded its earlier findings. However, the 2014 staff report was explicit that "[t]he Commission ha[d] expressed no view regarding the analysis, findings, or conclusions contained herein." *Id.* at cover. Moreover, the report did not consider "the details of securities lending programs" of the kind to be disclosed under the Securities Lending Rule. *Id.* at 5. Instead, it analyzed the effects of revealing a short seller's identity in real time, something the Securities Lending Rule does not purport to do. *See id.* at 72, 80, 83. Thus, Petitioners fail to show a departure from prior practice, or even that the Rule and the 2014 staff report are at variance.

At the end of the inquiry, the Securities Lending Rule falls well within the rulemaking authority granted the Commission by Dodd-Frank § 984(b) "to increase the transparency . . . [of] the loan or borrowing of securities."

11

Nothing in the text or structure of Dodd-Frank suggests that § 929X impinges upon that authority. The Commission thus acted within its statutory bounds in adopting the Rule, and Petitioners' contention to the contrary lacks merit.

## B.

In the initial draft of the Securities Lending Rule, all reportable data were required to be reported within fifteen minutes of a covered transaction. Proposed Securities Lending Rule, 86 Fed. Reg. at 69851–52. The final Rule adjusted the reporting timeline to the end of the day, with publication set for the following business day for most data, and twenty business days later for loan size information. Securities Lending Rule, 88 Fed. Reg. at 75665, 75690, 75709–10. Petitioners question the adequacy of the public comment period as to the final Rule's twenty-day delay for release of loan size data, arguing that the Commission should have provided new opportunity for public comment on the adjusted reporting timeframe. The Commission counters that the twenty-day delay was a logical outgrowth of the proposed Rule, which itself carried ample opportunity for meaningful public comment.

The APA requires an agency to provide notice and an opportunity for interested persons to participate in a rulemaking. *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (citing 5 U.S.C. § 553(c)). Notice of a final rule is sufficient if the final version is a "logical outgrowth" of the proposed rule. *Id.* (quoting *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019)). Notice and request for comment must "adequately frame the subjects for discussion" such that "the affected party 'should have anticipated' the agency's final course in light of the initial notice." *Id.* (quoting *Nat'l Lifeline Ass'n*, 921 F.3d at 1115). "The agency [is] not required to specifically identify every precise proposal which the agency might ultimately adopt, and it permissibly implement[s] changes in the final

rule instigated by . . . comments during the rulemaking." *Id.* at 448 (internal quotation marks omitted) (quoting *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989)).

Here, the Commission "sought comment on the ultimate subject" at issue, *id.*, as it solicited comments about the effects and timing of reporting and publication of securities lending data when it proposed the Securities Lending Rule. *See* Proposed Securities Lending Rule, 86 Fed. Reg. at 69813 (expressly asking for commenters' input as to the timing of data reporting and publication). The Commission also "apprised interested parties of the related issues under consideration by offering" alternative publication and reporting proposals and inviting interested parties to suggest others. *See Huawei*, 2 F.4th at 448. Indeed, many commenters to the proposed Rule expressed concern that publicizing transaction-level securities loan data on a fifteen-minute timeline would reveal short sale trading strategies and suggested alternative timelines, such as on a weekly basis. *E.g.*, Alternative Investment Management Association, Comment Letter on Proposed Securities Lending Rule, 4–5, 5–6 n.12 (Jan. 7, 2022) (commenting that loan-level data should not be made public on intra-day basis); Investment Company Institute, Comment Letter on Proposed Securities Lending Rule, 11 (Jan. 7, 2022) (same). Far from depriving the public of meaningful opportunity for comment, the record shows that the Commission considered the public's input and responded by adopting an end-of-day, rather than a fifteen-minute, reporting interval, and by delaying the publication of loan size information by twenty business days. Securities Lending Rule, 88 Fed. Reg. at 75684, 75660. Given this record, the Commission did "all the APA demands." *Huawei*, 2 F.4th at 448 (quoting *Chem. Mfrs. Ass'n*, 870 F.2d at 203).

**IV.**

Petitioners similarly challenge the Short Sale Rule as unlawful. Specifically, they contend that (A) the Commission did not reasonably explain why it did not use a less burdensome alternative to its EDGAR reporting system and (B) the Short Sale Rule has impermissible extraterritorial application. We again disagree.

**A.**

Petitioners first contend that the Commission failed to explain why it did not pursue a less burdensome reporting alternative for compliance with the Short Sale Rule, namely, FINRA's existing disclosure infrastructure, which the Securities Lending Rule utilizes. Petitioners assert that because FINRA already collects and publishes much of the information that the Short Sale Rule requires to be disclosed, using FINRA's system would be less burdensome than creating an entirely new reporting regime through the Commission's EDGAR system. Under arbitrary-and-capricious review, the Commission must show that it "reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (citing authority). "That requires the agency to consider all relevant factors raised by the public comments and provide a response to significant points within." *Chamber of Com. of U.S. v. SEC* (*Chamber of Com. (Fifth Circuit)*), 85 F.4th 760, 774 (5th Cir. 2023) (citing *Huawei*, 2 F.4th at 449). "Comments the agency must respond to include those that can be thought to challenge a fundamental premise underlying the proposed agency decision or include points that if true and adopted would require a change in an agency's proposed rule." *Id.* (cleaned up).

Petitioners offer a host of reasons why the Rule's utilization of EDGAR is flawed and why FINRA's reporting system is preferable. But their assertion that the Commission did not consider using FINRA's system

or explain its decision to use EDGAR instead falters against the record. The Commission discussed FINRA's system multiple times in the final Short Sale Rule. In the end, the agency emphasized that FINRA's system is only applicable to some users subject to the Rule, such that it would not facilitate the level of transparency that EDGAR would provide. *E.g.*, Short Sale Rule, 88 Fed. Reg. at 75105, 75148 n.493, 75176.

Further, responding to public comments that EDGAR poses increased cybersecurity risks, the Commission stated that the likelihood of a breach was low because the agency "recently deployed security and modernization enhancements focusing on technology upgrades to the EDGAR system." *Id.* at 75172. Thus, the Commission "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" which is all that is required to hurdle arbitrary-and-capricious review. *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168). Even if Petitioners are correct that FINRA's is the better system, that answers the wrong question. The APA only requires the Commission to show that it "reasonably considered the relevant issues and reasonably explained [its] decision," *Prometheus Radio Project*, 592 U.S. at 423, and addressed "all relevant factors raised by the public comments and . . . significant points within," *Chamber of Com. (Fifth Circuit)*, 85 F.4th at 774 (citing *Huawei*, 2 F.4th at 449). It did so here, and Petitioners' challenge on this point fails.

## B.

Petitioners also raise the Short Sale Rule's purported extraterritorial effects, contending that the Rule impermissibly reaches foreign securities transactions. For support, they point to the Rule's language:

> The Commission understands [the Short Sale Rule], by its terms, to apply to any institutional investment manager already subject to U.S. reporting requirements. This indicates that the relevant domestic conduct under [the Rule's] section 13(f)(2) is being an institutional investment manager operating in the U.S. securities markets such that the investment manager is subject to filing reports with the Commission. Thus, when that relevant domestic conduct is present here in the United States, [the Short Sale Rule's] regulatory reporting obligation will generally apply.

Short Sale Rule, 88 Fed. Reg. at 75109; *see* 17 C.F.R. § 240.13f-2.

Petitioners take this language to mean that "once a manager must comply with unspecified 'U.S. reporting requirements' for any aspect of its operations, the Rule requires that manager to report . . . all of its short-sale activity around the globe, regardless of where the trades occur or what securities are involved." They point to the Rule's reporting requirements, which extend to "all accounts over which the [reporting entity] has investment discretion that meet or exceed a quantitative reporting threshold." Short Sale Rule, 88 Fed. Reg. at 75105 (footnote omitted). Petitioners argue these provisions require a global reporting system, such that "any non-U.S. manager, because of any services it may provide to some small number of U.S. clients, is required to file any reports with the Commission."

However, viewing the Short Sale Rule in full disproves Petitioners' argument. The proposed version of the Rule only aimed to apply to "equity securities consistent with the Commission's [existing] short sale regulations (i.e., Regulation SHO[6])," which do not reach securities traded outside of

---

[6] SEC Regulation SHO, 17 C.F.R. §§ 242.200–.204. Regulation SHO was promulgated, *inter alia*, to "[e]stablish uniform locate and delivery requirements in order

the United States.  Proposed Short Sale Rule, 87 Fed. Reg. at 14965–66 (italics omitted); *see also* Short Sales, 69 Fed. Reg. 48008, 48014 n.54 (Aug. 6, 2004) ("Any broker-dealer using the United States jurisdictional means to effect short sales in securities traded in the United States would be subject to Regulation SHO . . . ."). The final Rule adopted the same, domestic, parameters. Short Sale Rule, 88 Fed. Reg. at 75109 ("[T]he Commission is adopting Rule 13f-2 and Form SHO to help enhance transparency regarding short selling in equity securities—including both exchange-listed and over-the-counter securities, and ETFs—that are already subject to Regulation SHO."). Nothing in either the proposed or final versions of the Rule suggest any contrary extraterritorial reach.

Because the Short Sale Rule, by its terms, is cabined to cover only equity securities "already subject to Regulation SHO" and because Regulation SHO solely applies to equity securities traded in the United States, it follows that the Short Sale Rule does not carry any improper extraterritorial application. Short Sale Rule, 88 Fed. Reg. at 75100, 75109. Petitioners' argument thus lacks merit.

## V.

Petitioners also lodge a challenge to the Rules in tandem, arguing that their near-simultaneous adoption is arbitrary and capricious. Petitioners assert that because the Rules are highly interrelated, the Commission was required to consider more fully their interplay when promulgating them. They contend that the Commission (A) did not adequately justify the Rules' contradictory approaches to disclosure reporting and (B) failed to assess the cumulative economic impact of the Rules, in violation of the APA and the

---

to address potentially abusive naked short selling and other problems associated with failures to deliver." Short Sales, 69 Fed. Reg. 48008, 48028 (Aug. 6, 2004).

Exchange Act. In these respects, Petitioners assert that the Commission "entirely failed to consider an important aspect of the problem[s]" the Rules aim to ameliorate. *State Farm*, 463 U.S. at 43; *see also Bus. Roundtable*, 647 F.3d at 1148. Petitioners' first contention falters against the administrative record, but their second has merit.

## A.

Petitioners premise their first argument on the notion that, due to the high correlation between short sales and securities lending, the Rules effectively treat the same data inconsistently. They posit that securities lending data and short sale information are essentially two sides of the same coin—so much so that they are direct proxies for each other—such that the Securities Lending Rule mandates disclosure of the very information that the Short Sale Rule ostensibly protects. From this premise, Petitioners argue that the Rules are inherently at cross purposes and, therefore, are arbitrary and capricious.

If Petitioners were correct that lending and short sale data are in fact proxies for each other, then the Rules would somewhat function as a regulatory pushmi-pullyu, with one Rule materially undermining the other. But Petitioners' premise is faulty, even granting some tension between the Rules. Certainly, the Rules espouse divergent approaches in their respective disclosure regimes. The Short Sale Rule eschews immediate, individualized reporting of covered transactions; as the Commission explained, "the anticipated benefit of enhanced transparency" from individualized transaction-by-transaction data would "not justify the costs," including the "potential to reveal a reporting [institutional investment manager]'s trading strategies." Short Sale Rule, 88 Fed. Reg. at 75132–33. Yet the Securities Lending Rule requires almost immediate reporting of individualized, trade-by-trade data (except for loan size, which is published after twenty business

days). The Commission acknowledged that aggregate loan data would "reduce the risk of exposing short selling strategies," but concluded that aggregate data "would not provide the same transparency benefits." Securities Lending Rule, 88 Fed. Reg. at 75726, 75132.

To be sure, lending and short sale data are correlated, inevitably giving rise to significant interplay between the Rules. The Commission itself conceded as much, as evidenced by its reopening the comment period for the Securities Lending Rule when it proposed the Short Sale Rule, "so that commenters may consider whether there would be any effects of [the Proposed Short Sale Rule] that the Commission should consider in connection with [the Proposed Securities Lending Rule]." Reopening of Comment Period for Reporting of Sec. Loans, 87 Fed. Reg. at 11659. And throughout the rulemaking process, the Commission expressly noted that the two sets of data significantly overlap: "A primary reason for borrowing equity shares is to facilitate a short sale." Proposed Securities Lending Rule, 86 Fed. Reg. at 69831; *see also* Securities Lending Rule, 88 Fed. Reg. at 75696 ("[T]he majority of equity securities lending, particularly in the Customer market, occurs to facilitate short selling."). The Commission explained that a major reason for this overlap is that "[i]nvestors' ability to use securities loans for purposes other than short selling is limited by the 'permitted purpose requirement' of . . . the Federal Reserve System's Regulation T." Securities Lending Rule, 88 Fed. Reg. at 75696. That regulation allows broker-dealers to "borrow or lend U.S. securities from or to" non-broker-dealers "solely 'for the purpose of making delivery of the securities in the case of short sales, failure to receive securities required to be delivered, or other similar situations,' unless an exemption applies." *Id.* (quoting 12 C.F.R. § 220.10); *see also id.* (acknowledging that "[t]his limitation results in a close correlation between information about aggregate Customer loan sizes and short interest").

Nonetheless, Petitioners' argument misses the mark because the data required to be reported under each Rule are distinct, even if there is a "close correlation" between the two sets of information. In other words, the securities lending data and short sale data covered by the Rules are not direct proxies for each other. While short selling may be the "primary reason" for securities loans, it is not the only reason. Loans are also used to hedge, close positions, and obtain collateral. *Id.* Thus, at least some disclosures made under the Securities Lending Rule would signify that parties to a loan may have closed or hedged a position, rather than sold short—shielding some of the data protected under the Short Sale Rule.

Regardless, the Commission grappled—adequately, for purposes of arbitrary-and-capricious review—with the data's related nature. That is the gravamen of our review: The APA only requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Chamber of Com. (Fifth Circuit)*, 85 F.4th at 768 (cleaned up) (quoting *State Farm*, 463 U.S. at 43). The Commission did that here, recurrently discussing the Securities Lending Rule's potential impact on short selling and explaining the agency's choices between transparency and protection of proprietary short sale strategies and information.

For example, the Commission expressly justified the transaction-by-transaction reporting required by the Securities Lending Rule, acknowledging the potential that such reporting "could increase the risk of revealing short sale strategies." Securities Lending Rule, 88 Fed. Reg. at 75684. The final Rule provides that "certain data elements will be made publicly available on a transaction-by-transaction basis and aggregate transaction activity and distribution of loan rates[] will also be made publicly available in an aggregated format for each reportable security." *Id.* In striking this attempted balance, the Commission articulated that "aggregate

transaction activity"—as added to the final Rule—"refers to information pertaining to the absolute value of transactions such that net position changes should not be discernable in the data." *Id.* By adopting this change, the Commission "intended to help ensure that only aggregate information about net positions changes, rather than individualized information, is provided to the public." *Id.* That addition "respond[ed] to commenters' concerns about the potential exposure of proprietary information, while still providing volume transparency to market participants." *Id.*; *see also id.* at 75678 n.506 ("The addition of the term 'aggregate transaction activity' in the final [R]ule limits the possibility of publishing proprietary information while still providing volume transparency to market participants.").

The Commission also determined that loan size information "is the portion of the data most directly related to short selling activity." *Id.* at 75710–11. Cognizant that loan size information in the customer market is the same as the size of a short position, *see id.* at 75705, the Commission delayed publication of transaction-by-transaction loan size data by twenty business days, *id.* at 75660. The final Rule explains that this change, coupled with the addition of "aggregate transaction activity," "should help reduce the potential to anticipate and reverse engineer the trading of competitors." *Id.* Publication of loan-size modifications was also delayed by twenty business days. *See* Securities Lending Rule, 17 C.F.R. § 240.10c-1a(g)(3)(ii).

Finally, the Commission contemplated that even though delayed loan-size data could provide some modicum of novel information about short sellers' strategies, "it is not clear that such an analysis, which would be inherently noisy, would provide actionable insights into future short selling activity that could harm short sellers' abilities to profit from negative information." Securities Lending Rule, 88 Fed. Reg. at 75711. The Commission emphasized that delayed disclosure "significantly reduce[s] the novelty of the information disseminated under the final [R]ule regarding

short sellers' positions, such that it is less timely than pre-existing sources of short selling transparency." *Id.* at 75665.[7]

On the record before us, the Commission "reasonably considered the relevant issues and reasonably explained the decision[s]" embodied in the final Rules regarding the interplay of the Rules' disclosure regimes. *Prometheus Radio Project*, 592 U.S. at 423. The data required to be reported pursuant to the Rules are not direct proxies for each other; regardless, though Petitioners disagree with the Commission's approach, the agency "consider[ed] all relevant factors raised by the public comments and provide[d] a response to significant points" raised therein. *Chamber of Com. (Fifth Circuit)*, 85 F.4th at 774 (citing *Huawei*, 2 F.4th at 449).

**B.**

Petitioners last argue that the Commission failed fully to assess the economic impact of the two Rules, as required by the APA and the Exchange Act. In addition to the more-generally applicable constraints on agency action contained in the APA, the Exchange Act requires the Commission to "consider or determine whether an action is necessary or appropriate in the public interest" and "whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. § 78c(f). *Inter alia*, that statutory obligation mandates the Commission to "determine as best it can the economic implications of the rule it has proposed." *Chamber of Com. (D.C. Circuit)*, 412 F.3d at 143. The question in today's case is whether the Commission was required to consider the Rules' *collective* economic impact. Given the Rules' significant interplay and their nearly concurrent promulgation, the agency should have done so. Because it did not, we agree

---

[7] For example, FINRA Rule 4560 requires FINRA member firms to report their short positions in all equity securities to FINRA twice a month.

No. 23-60626

with Petitioners that the Commission "failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, such that remand is required.

Under the Commission's "long-standing practice," the required "economic analysis in each adopting release considers the incremental benefits and costs for the specific rule—that is, the benefits and costs stemming from that rule compared to the baseline." Securities Lending Rule, 88 Fed. Reg. at 75719. That baseline is used to gauge a proposed rule's "potential costs and benefits including effects on efficiency, competition, and capital formation" and is "the best assessment of how the world would look in the absence of the proposed action." *Id.* at 75694 n.724. The baseline includes "existing regulatory requirements, including recently adopted rules." *Id.* at 75694.

As discussed above, the Commission enacted the Securities Lending Rule and Short Sale Rule on the same day, with the former finalized according to Petitioners "mere minutes" before the latter. The Commission discussed the first-adopted Securities Lending Rule in the economic impact analysis of the later-adopted Short Sale Rule, but not vice versa. In the Commission's telling, it did not need to account for the Short Sale Rule in the Securities Lending Rule's economic baseline because the Short Sale Rule "remain[ed] at the proposal stage." *Id.* at 75695. The Commission reasons that "[t]he best assessment of how the world would look in the absence of the proposed or final action typically does not include recently proposed actions, because that would improperly assume the adoption of those proposed actions." *Id.* at 75694 n.724. Instead, the rulemaking baseline should "reflect the regulatory landscape that is current at that time." *Id.* at 75695.

All true enough as a general matter. But here, in the context of highly interrelated Rules enacted contemporaneously during the same open meeting, the Commission's approach was a short-cutting fiction that does

not survive scrutiny. In reality, the Short Sale Rule only "remain[ed] at the proposal stage" for an hour or so after the Securities Lending Rule was adopted, and the agency clearly planned to adopt the Rules together. *SEC, 2023 10 13 Open Meeting*, at 1:08:20, 2:23:08 (YouTube Oct. 13, 2023), www.youtube.com/watch?v=NVRu8eBHkGo (Securities Lending Rule adopted at timestamp 1:08:20, and Short Sale Rule adopted at timestamp 2:23:08). Given the close temporal proximity of the Rules' adoption and their interrelatedness, the Commission was thus not free to ignore the economic impact of the Short Sale Rule upon the Securities Lending Rule; the agency needed to consider the Rules' collective economic effects. *See Chamber of Com. (D.C. Circuit)*, 412 F.3d at 143.

The Commission contends that it would amount to improper "double-counting" to factor the Rules into each other's baselines. But that contention presupposes that the earlier-adopted regulation's effects on the later-adopted regulation are the same as the reverse. This is not inherently true. Indeed, the Commission argues mightily that the data required to be disclosed under each Rule are not 1:1 proxies for each other, but are distinct, if overlapping, sets of information. *See supra* Part V.A. And the two Rules affect different parties, such that the Short Sale Rule's effects on those governed by the Securities Lending Rule will not equate with the Securities Lending Rule's effects on those regulated by the Short Sale Rule. *Compare* Short Sale Rule, 88 Fed. Reg. at 75102 (stating the Rule will apply to "institutional investment managers"), *with* Securities Lending Rule, 88 Fed. Reg. at 75650–51 (stating the Rule will apply to intermediaries, lenders, and broker or dealers). Thus, the Commission's opting to perform a more comprehensive analysis for only the later-adopted Rule "is nothing more than a determination that [the Commission] would not address the problem unless it happened to appear at an inconvenient time—an eventuality over

which [the Commission] had full control." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) (per curiam).

And the Commission's logic is irredeemably illogical: The agency's principal justification—that it was not required to factor the Short Sale Rule's impacts into the economic analysis of the Securities Lending Rule because the Short Sale Rule was merely proposed—applies just as well to the pending Securities Lending Rule. In other words, *both* Rules were only proposals when the Commission drafted the Short Sale Rule and slated it for adoption. Because the Commission sequentially adopted the two overlapping Rules during the same meeting, it was not free to pick one and treat it as "adopted" while discounting the other as just an ephemeral "proposed rule" to sidestep considering the combined economic impact of the two. *See id.* 665 F.3d at 187 ("It is not absurd to require that an agency's right hand take account of what its left hand is doing."). Doing so amounted to regulatory sleight of hand that neither the APA nor the Exchange Act countenances. *See id.* at 187 ("[A]n agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking."); *cf. Off. of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1441–42 (D.C. Cir. 1983) (finding it "beyond belief" that an agency would take rulemaking action undercutting another "concurrent" rulemaking process).

The Commission's short-cut approach is belied by its own procedural history in promulgating the Rules. The Commission reopened the comment period for the proposed Securities Lending Rule when it proposed the Short Sale Rule, acknowledging the interplay between the Rules, i.e., that the latter Rule impacted the former (and vice-versa). Reopening of Comment Period for Reporting of Sec. Loans, 87 Fed. Reg. at 11659 ("[C]ommenters may consider whether there would be any effects of [the Proposed Short Sale

Rule] that the Commission should consider in connection with [the Proposed Securities Lending Rule].""). Comments to both Rules demonstrated the same, as did the Commission's explanations and revisions in response to the comments. *E.g.*, Managed Funds Association and National Association of Private Fund Managers, Comment Letter on the Proposed Rules (July 21, 2023) (commenting that "it is critical that the Commission consider the aggregate costs and benefits of its rulemakings on advisers, investors, and the markets, as well as how each rule may intersect or impact other rules"); Short Sale Rule, 88 Fed. Reg. at 75162 (stating that Short Sale Rule data for open positions "could be combined with FINRA short interest and [Securities Lending Rule] data to estimate the proportion of short positions held by large short sellers"). Basically, the two Rules traveled through the rulemaking process together and then were adopted during the same meeting. Given the Commission's failure to account for the Short Sale Rule in the Securities Lending Rule's economic baseline, the Commission failed to "examine the relevant data and articulate a satisfactory explanation for its action," *State Farm*, 463 U.S. at 43, and further "fail[ed] to apprise . . . the public . . . of the economic consequences of [the] proposed regulation[s]," *Bus. Roundtable*, 647 F.3d at 1148 (internal quotation marks omitted).

Putting each of the Rules into silos also goes against the Commission's prior practice. The agency has often treated related rules as adopted concurrently and factored them into each other's economic analysis. *E.g.*, Investment Company Reporting Modernization (Modernization Rule), 81 Fed. Reg. 81870 (Nov. 18, 2016); Investment Company Liquidity Risk Management Programs (Liquidity Rule), 81 Fed. Reg. 82142 (Nov. 18, 2016). For instance, in 2019, the Commission adopted its Regulation Best Interest and Form CRS during the same open meeting. SEC Open Meeting Agenda (June 5, 2019), https://www.sec.gov/news/openmeetings /2019/agenda060519.htm; *see* Regulation Best Interest: The Broker-Dealer

Standard of Conduct (Regulation Best Interest), 84 Fed. Reg. 33318 (July 12, 2019); Form CRS Relationship Summary; Amendments to Form ADV (Form CRS), 84 Fed. Reg. 33492 (July 12, 2019). In the final Regulation Best Interest's economic analysis, the Commission addressed the joint "costs of Regulation Best Interest and Form CRS," 84 Fed. Reg. at 33437, and in the final Form CRS's economic analysis, the Commission explained why it adopted a different definition of a similar term in Regulation Best Interest, 84 Fed. Reg. at 33593. The rules' benefits and costs resulting from their interplay were frequently discussed throughout their respective economic analyses as well. *See, e.g.*, Regulation Best Interest, 84 Fed. Reg. at 33437; Form CRS, 84 Fed. Reg. at 33568, 33577 n.1004, 33578, 33597; *see also* Modernization Rule, 81 Fed. Reg. at 81985 (discussing concurrently adopted Liquidity Rule); Liquidity Rule, 81 Fed. Reg. at 33593 (in turn discussing Modernization Rule).

As discussed above, the Short Sale Rule was not just "recently proposed" by the time the Securities Lending Rule was slated for adoption. It was proposed on February 25, 2022, more than a year and a half before it was adopted on October 13, 2023, the same day as the Securities Lending Rule. Thus, the general principle that a rule's economic baseline should not include recently proposed rules because they may never be adopted simply does not hold in this case. If anything, the record demonstrates that the two Rules were to be adopted concurrently all along. *E.g.*, Short Sale Rule, 88 Fed. Reg. at 75148, 75155–56, 75162; *see also* Reopening of Comment Period for Reporting of Sec. Loans, 87 Fed. Reg. at 11659 (reopening comment period "so that commenters may consider whether there would be any effects of [the Short Sale Rule] . . . in connection with [the Securities Lending Rule]"). This comports with the Commission's approach in analogous situations. *See, e.g.*, Modernization Rule, 81 Fed. Reg. at 81872 n.11. And commenters expressly requested that the Commission consider the interplay

between the Rules. *E.g.*, Managed Funds Association, Comment Letter on Proposed Short Sale Rule, R. Doc. 63-2 at pp. 260–70 (June 15, 2023); Managed Funds Association and National Association of Private Fund Managers, Comment Letter on the Proposed Rules, R. Doc. 63-2 at pp. 272–307 (July 21, 2023); Alternative Investment Management Association, Comment Letter on Proposed Short Sale Rule, R. Doc. 63-2 at pp. 173–88 (Apr. 26, 2022); Investment Company Institute, Comment Letter on Proposed Rules, R. Doc. 63-1 at pp. 339–51 (Aug. 17, 2023); Managed Funds Association, Comment Letter on Securities Lending Rule, R. Doc. 63-1 at pp. 275–80 (Apr. 1, 2022); Alternative Investment Management Association, Comment Letter on Proposed Rules, R. Doc. 63-1 at pp. 264–67 (Apr. 1, 2022).

The Commission's omission of any discussion synergizing the collective economic impact of the Rules in the Securities Lending Rule, based on these comments or otherwise, contravenes the bedrock principle that "[a]n agency must consider and respond to significant comments received," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015), and shows that the Commission "failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43; *accord Bus. Roundtable*, 647 F.3d at 1148. Nor may the Commission sidestep an appraisal of the cumulative impact of the Rules by arguing that the Rules' interplay is adequately captured in the economic baseline of the later-adopted Short Sale Rule. Regardless of whether the Short Sale Rule gave a nod to the "potential economic effects arising from any overlap between the compliance period for the final amendments and [the Securities Lending Rule]," Short Sale Rule, 88 Fed. Reg. at 75149, the failure of the Securities Lending Rule to factor in the Short Sale Rule still causes the tandem Rules to be insufficiently explained, such that the Commission failed to justify the regulations under the APA and the Exchange Act.

We hasten to emphasize the limited nature of our holding: We express no general view on when or how cumulative economic impact analyses should be conducted in other cases involving multiple proposed rules with potentially overlapping economic implications. To the contrary, we accept *arguendo* that in the mine's run of cases, a rule's economic baseline need not include subsequently proposed rules because such draft regulations may never be adopted. But in this case, the Commission erred by failing to consider the economic impact the Short Sale Rule would have on the Securities Lending Rule when the Rules were promulgated in tandem and were adopted concurrently.

"Remand without vacatur of the agency action is 'generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so.'" *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022) (quoting *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021)). As that appears to be the case here, remand of both Rules is warranted to allow the Commission to analyze their cumulative economic impact and responding to further comments in view of that analysis.

## VI.

For the foregoing reasons, we GRANT the petition for review in part and REMAND the Securities Lending Rule and the Short Sale Rule to the Commission to allow the agency to consider and quantify the cumulative economic impact of the Rules, consistent with this opinion. *See Chamber of Com. (Fifth Circuit)*, 85 F.4th at 780. We otherwise DENY the petition for review.